## MATTER OF FAKALATA

In Visa Petition Proceedings

A-22464956

*Decided by Board March 10, 1982*

(1) In order to prove that a customary adoption is valid for immigration purposes, the petitioner must establish that the adoption creates a legal status or relationship which is recognized by the government of the place where it occurred as carrying with it substantial legal rights and obligations.

(2) Notwithstanding that the Crown Solicitor of Tonga is of the opinion that customary adoptions in that country create a new parent and child relationship, the facts indicate that this relationship is not exclusive of the natural parents, does not give the adopted child rights and duties comparable to a natural legitimate child, and does not have any legal effect under Tongan law.

(3) Where the petitioner has failed to prove that customary adoptions in Tonga create a parent and child relationship which establishes legal rights and obligations that are sanctioned by Tongan law, such adoptions are not recognized as valid under United States immigration laws. *Matter of Palelei*, 16 I&N Dec. 716 (BIA 1979) reaffirmed.

(4) Although a Tongan customary adoption was recognized as valid for immigration purposes in *Mila v. District Director of Denver*, Colorado, 494 F.Supp. 998 (D. Utah 1980), that decision is not binding in cases, as the instant one, arising outside of the jurisdiction of the District of Utah.

ON BEHALF OF PETITIONER:  Terry J. Helbush, Esquire
Simmons and Ungar
417 Washington Street
San Francisco, California 94111

BY:  Milhollan, Chairman; Maniatis, Maguire, Morris, and Vacca, Board Members

The lawful permanent resident petitioner applied for preference status on behalf of the beneficiary as his adopted son under section 203(a)(2) of the Immigration and Nationality Act, 8 U.S.C. 1153(a)(2). In a decision dated October 1, 1979, the District Director denied the petition. The petitioner has appealed from that decision. The appeal will be dismissed.

The petitioner is a 72-year-old native and citizen of Tonga. The beneficiary is also a native and citizen of Tonga who was born the legitimate son of the petitioner's cousin on June 30, 1951. At the age of 9 months, the beneficiary was taken into the petitioner's home and was raised as a

213

member of his family. The petitioner argues that under these circumstances the beneficiary qualifies as his adopted son under the customary law of Tonga.

The District Director denied the petition on the ground that the "adoption" did not create a legal status or relationship under Tongan law and therefore was not legally valid. In reaching this conclusion, he relied on our decision in *Matter of Palelei*, 16 I&N Dec. 716 (BIA 1979), where we found that a customary adoption in Tonga would not be considered valid for immigration purposes. In that decision we noted the opinion of the Crown Solicitor of Tonga which stated that a customary adoption was not recognized as legally valid under the law of that country.

On appeal, the petitioner has submitted another opinion from the Crown Solicitor of Tonga dated July 18, 1980, which states, in pertinent part:

> In Tonga, there is no reported "law" concerning parental rights and duties and children's rights and duties when customarily adopted. Tongan customary adoptions are an important aspect of our traditional culture and continue to be practiced today very commonly. There is no need for anyone to go to the courts to enforce parental rights or duties or children's rights or duties because everyone understands that customarily adopted children are treated in all respects as if they were legally adopted except that they cannot inherit. Even illegitimate children adopted according to our statutory law cannot inherit, but they also are considered legally adopted.
>
> Customary adoptions used to [sic] prior to our Constitution allow the adopted children to succeed to estates and titles, but the Constitution forbade the inheritance or succession by adopted children. But, the Constitution did not outlaw customary adoptions. They have continued until this day. Many families in Tonga have one or more members who are adopted. The adopted children cannot succeed to the estates of their parents, but in all other ways, they are considered the real children of their adopting parents. Such adoptions have the effect in Tonga of creating a parent and child relationship.

According to the petitioner, the Crown Solicitor's statement that customary adoptions create a parent and child relationship indicates that such adoptions are legally recognized in Tonga. Citing our decisions in *Matter of Ng*, 14 I&N Dec. 135 (BIA 1972), and *Matter of Yue*, 12 I&N Dec. 747 (BIA 1968), he notes that the Board has previously recognized customary adoptions as valid for immigration purposes. He therefore contends that we should overrule our decision in *Matter of Palelei*, *supra*, and find his customary adoption of the beneficiary valid for immigration purposes. After careful consideration, we decline to so act.

The Board has indeed accorded preference status based upon a claimed customary adoption under Chinese law. *See Matter of Rodriguez*, 14 I&N Dec. 335 (BIA 1973); *Matter of Poon*, 14 I&N Dec. 155 (BIA 1972); *Matter of Ng*, *supra; Matter of Yue*, *supra*.

However, the customary law applied in those cases consisted of an established system of law which was based on the Ching Code. The law set forth specific rules relating to adoption and was recognized in the Chinese courts as determinative of the validity of customary adoptions

and the legal rights and duties of the parents and children involved in them. *See Matter of Poon, supra; Matter of Ng, supra; Matter of Chin*, 12 I&N Dec. 240 (BIA 1967). Thus, where we have found that the claimed adoptions did not comply with the provisions of that customary law, we have considered them invalid for immigration purposes. *See Matter of Lee*, 15 I&N Dec. 221(BIA 1975).

On the other hand, in countries where adoption is practiced according to local custom, but does not create substantial legal rights and obligations which are sanctioned by the government as having legal force, the Board has declined to give such customary adoptions recognition. *See Matter of Benjamin*, 15 I&N Dec. 709 (BIA 1976); *Matter of Rehman*, 15 I&N Dec. 512 (BIA 1975); *Matter of Mozeb*, 15 I&N Dec. 430 (BIA 1975); *Matter of Bhegani*, 15 I&N Dec. 299 (BIA 1975); *Matter of Kong*, 14 I&N Dec. 649 (BIA 1974), motion to reconsider denied, *Matter of Kong*, 15 I&N Dec. 224 (BIA 1975); *Matter of Ashree, Ahmed and Ahmed*, 14 I&N Dec. 305 (BIA 1973); *Matter of Boghdadi*, 12 I&N Dec. 6 (BIA 1968); *Matter of B-*, 9 I&NDec. 521 (BIA 1961).

We must therefore determine whether customary adoption in Tonga creates a legal status which is recognized by the government in that country as carrying with it substantial legal rights and obligations. The evidence which best indicates the Tongan government's position regarding customary adoption consists of the two opinions offered by the Crown Solicitor. In the first of those opinions, which we cited in *Matter of Palelei, supra*, the Crown Solicitor unequivocally pronounced that "there is no provision in our law for the adoption of children born legitimately" and that a customary adoption "is not recognized as legally valid under Tongan law." He further notes in his second opinion that there is no reported law concerning the rights and duties of parents or children involved in customary adoptions. This lack of judicial law is attributed to the fact that "everyone understands that customarily adopted children are treated in all respects as if they were legally adopted except that they cannot inherit." In conclusion, the Crown Solicitor states that customary adoptions have the effect in Tonga of creating a parent and child relationship.

Other evidence relating to the legal effect of customary adoptions in Tonga includes a statement from Mr. William Clive Edwards, who states that he is a licensed lawyer of the Supreme Court of Tonga, and a monograph entitled "Tongan Adoption." Morton, *Tongan Adoption*, in Transactions in Kinship—Adoption and Fosterage in Oceania 64 (I. Brady ed. 1976). Mr. Edwards asserts that the law "in Tonga only enables illegitimate children to be adopted and it does not allow for adoption of legitimate issues." Mr. Morton offers the following statement in regard to adoption transactions in Tonga:

The Tongan government sanctions only a few of these adoptions. Few applications for

legal adoption are made to the courts because the circumstances of Tongan adoption are often incongruent with the European model of adoption applied in the courts.

*Morton, supra,* at 65.

According to these sources, the statutory law of Tonga only provides for the adoption of illegitimate children and does not officially recognize the adoption of legitimate children as establishing any rights or duties of the parties involved.[1] From this we must conclude that customary adoptions, which are apparently accomplished without the benefit of any ceremony or formal proceedings, do not create a legal status or relationship under Tongan law.

The petitioner argues that the Crown Solicitor has indicated that customary adoptions are legally recognized in Tonga by his statement that these adoptions create a parent and child relationship. However, our examination of Mr. Morton's treatise on adoptions in Tonga persuades us that the parent and child relationship resulting from a customary adoption does not carry with it such rights and obligations as we would characterize as legally sanctioned. For example, he states that "[i]n contrast to Western practices of child rearing, the rights and duties of jural parenthood extend to a large number of kinsmen, neighbors, and friends." *Morton, supra,* at 65. He further explains that children are considered to be valuable resources which are essentially shared among kinsmen and that adoption transactions are a means of strengthening the bonds of kinship. (pp. 73, 76, 77).

According to Mr. Morton, the adoption of a child does not significantly alter his kinship status as acquired at birth through his natural parents, but rather provides him with two overlapping kindreds because most adoptions take place between blood relatives (p. 77). Since an adopted child's relationship to his natural parents is generally a continuing one, he benefits from the adoption in that it gives him the advantage of manipulating his kinship status by stressing his relationship to either his natural parents or his adoptive parents (pp. 77–78, 80).

Although a new parent and child relationship may be created through customary adoption in Tonga, it appears that it is not exclusive since the relationship of an adopted child to his natural parents is diminished only by his own choice. A system which gives an adopted child the option to maintain a legal relationship with his natural parents is inconsistent with our concept of adoption and with section 101(b)(1)(E) of the Immigration and Nationality Act, 8 U.S.C. 1101(b)(1)(E). Consequently, we are not convinced that the parent and child relationship resulting from Tongan customary adoption creates rights and duties which we would

---

[1] According to Mr. Edwards and the opinions of the Crown Solicitor of Tonga, Cap. 19 of the Laws of Tonga sets forth a procedure for the adoption of illegitimate children. That type of adoption in Tonga is not now before us, so we need not determine its validity for immigration purposes at this time.

recognize as enforceable by law.

Also of significance to our inquiry is the fact that the Constitution of Tonga prohibits the inheritance of land by children who are adopted according to customary practice. Although the petitioner notes that the Board has found Chinese customary adoptions which bestowed no succession rights to be valid for immigration purposes in *Matter of Ng, supra*, and *Matter of Yue, supra*, we believe that the situation presented here is distinguishable. Under Chinese customary law, two kinds of adoption exist: (1) adoption of a male child for the purpose of instituting him as an heir for perpetuation of the ancestral cult, which requires that the child come from the same kindred and have the same surname, and (2) adoption of a child, whether male or female, without intending to institute it as an heir. *See Matter of Young*, 14 I&N Dec. 158 (BIA 1972); *Matter of Poon, supra; Matter of Ng, supra; Matter of Chin, supra.* Thus, although male children who are without the required qualifications and all females may not inherit from their adoptive parents under Chinese customary law, they are nonetheless recognized as having equal status with those natural children who also do not have the right to inherit. *See Matter of Ng, supra.*

On the other hand, children adopted in Tonga pursuant to custom are not permitted to inherit and therefore do not have rights comparable to those of natural legitimate children. The Board has refused to recognize as valid for immigration purposes customary adoptions which do not accord adopted children a status similar to that of natural children. *See Matter of Mozeb, supra, Matter of Kong, supra.*

Customary adoptions in Tonga do not give the adopted child a legal status or relationship which bestows rights and obligations comparable to those of natural legitimate children and they do not appear to have any legal effect under Tongan law. The Crown Solicitor's original conclusion that customary adoptions are not recognized as legally valid has not been retracted or contradicted, nor has the petitioner offered any evidence which has persuaded us that they have any legal effect. We therefore conclude that these adoptions should not be recognized as valid for immigration purposes.

We note in this regard the suggestion by Mr. Morton that an adoption may be obtained through application to the courts which is recognized by Tongan law as according rights of succession to the adopted child. Morton, *supra* at 65, 71. The petitioner has offered no evidence that would either verify or refute the existence of such a procedure. However, if a means of acquiring legal sanction for an adoption is available, we believe that our immigration laws would require a person seeking immigration benefits on the basis of an adoption in Tonga to obtain the endorsement of law in that manner.

We are aware of the decision in *Mila v. District Director of Denver,*

217

*Colorado,* 494 F.Supp. 998 (D. Utah 1980), which concludes that Tongan customary adoptions should be recognized as valid for immigration purposes. With all due respect to the court, we do not accept its opinion as definitive on this issue. The fact that a lower federal court has rejected a legal conclusion of this Board does not require us to recede from that conclusion in other jurisdictions. *See Matter of Amado and Monteiro,* 13 I&N Dec. 179 (BIA 1969); *Matter of Lim,* 13 I&N Dec. 169 (BIA 1969).

We disagree with the court's conclusion that there is no reason to make a distinction between a system of adoption where a parent-child relationship is sanctioned by law and one where it is only recognized by custom. We believe that the recognition of an adoption by the law of the country where it took place offers some assurance that the adoption is valid. Thus, in our opinion, evidence that an adoption is legally sanctioned provides a necessary safeguard against the possibility of fraud which Congress carefully sought to avoid.[2] It does not therefore appear unreasonable to require that the legal system under which an adoption took place must recognize that it creates rights and duties which are enforceable by law.

It is the petitioner's burden in visa petition proceedings to establish the claimed relationship. *See Matter of Brantigan,* 11 I&N Dec. 493 (BIA 1966). He further bears the burden of proving any foreign law on which he relies. *See Matter of Annang,* 14 I&N Dec. 502 (BIA 1973). We are not persuaded that the petitioner has met his burden in this case. Accordingly, for the reasons stated above, we shall dismiss the appeal. Our decision in *Matter of Palelei, supra,* is reaffirmed.

**ORDER:** The appeal is dismissed.

---

[2] The concern of Congress that a law granting immigration benefits on the basis of adoption might lead to abuse is reflected in the fact that no such provision was enacted until 1957. *See* S.Rep. 1515, 81st Cong., 2nd Sess. 468 (1950); Act of Sept. Sept. 11, 1957, Sec. 2, 71 Stat. 639. When it was passed, Congress set forth specific requirements for residence and legal custody and included a proviso limiting those entitled to benefit so as to prevent circumvention of the law by fraudulent adoptions. *See* section 101(b)(1)(E) of the Act.