MATTER OF MOZEB, et al.

In Exclusion Proceedings

A-20104497

A-20097838-9

A-20105846-7

*Decided by Board August 20, 1975*

(1) Since the law applicable in the Yemen Arab Republic is Islamic law which does not recognize the practice of adoption, relationships through claimed adoptions in Yemen cannot be established for immigration purposes (*Matter of Ashree, Ahmed and Ahmed,* 14 I. & N. Dec. 305 reaffirmed). The informal relationship termed "adoption" in the Yemen Arab Republic is merely in the nature of a charitable act to needy children and does not create a legal status comparable to that of a natural legitimate child.

(2) Since applicants are not entitled to immediate relative status on the basis of claimed adoption in the Yemen Arab Republic, the Service is not estopped from excluding them from admission under section 212(a)(20) of the Immigration and Nationality Act as immigrants without valid immigrant visas, notwithstanding visa petitions according them immediate relative status by virtue of the claimed adoption in the Yemen Arab Republic were approved by an American consular officer, and immigrant visas issued to two of the applicants, prior to the decision in *Matter of Ashree, Ahmed and Ahmed, supra.* Not only is the Service empowered to make a redetermination of an applicant's admissibility upon arrival at a port of entry with an immigrant visa, it is under an absolute duty to do so (sections 204(e) and 235(b) of the Act).

EXCLUDABLE: Act of 1952—Section 212(a)(20) [8 U.S.C. 1182(a)(20)]—Immigrant—no visa (all applicants)

ON BEHALF OF APPLICANTS:
Omar Z. Ghobashy, Esquire
730 Fifth Avenue, Suite 2007
New York New York 10019

ON BEHALF OF SERVICE:
Paul C. Vincent
Appellate Trial Attorney

In a decision dated February 20, 1975, the immigration judge found the five applicants inadmissible to the United States under section 212-(a)(20) of the Immigration and Nationality Act and he ordered their exclusion and deportation. All of the applicants have appealed from that decision. The appeals will be dismissed.

The five alien applicants are natives and citizens of the Yemen Arab Republic. The issues presented in these cases are substantially identical, and all of the applicants are represented by the same attorney.

Each applicant claims to be an adopted child of a United States citizen by virtue of an adoption that took place in the Yemen Arab Republic. In each case, a Form I-130, Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa, was filed with and approved by an American consular officer in the Yemen Arab Republic pursuant to 8 CFR 204.1(a). Thereafter, on March 30, 1972, we rendered our decision in *Matter of Ashree, Ahmed and Ahmed,* 14 I. & N. Dec. 305 (BIA 1973), holding that there was no system for legal adoption in either the Yemen Arab Republic or the People's Republic of Southern Yemen (now known as the People's Democratic Republic of Yemen).

Two of the applicants had been issued immigrant visas prior to the decision in *Ashree,* and all of the applicants arrived in the United States with immigrant visas between April and June of 1973. The immigration judge concluded, on the basis of *Ashree,* that none of the aliens were entitled to the status which they claimed, and that therefore all of the applicants were excludable under section 212(a)20 as immigrants without valid immigrant visas.

Counsel's primary contention is that there is no legal basis for our decision in *Ashree,* and that adoption does in fact exist in Yemen.

Our decision in *Ashree* was based upon a 29-page report on the Yemen Arab Republic and the People's Republic of Southern Yemen, prepared by the Near Eastern and African Law Division of the Library of Congress, dated March 9, 1973.[1] The report states that there is a scarcity of materials dealing specifically with Yemeni law, and that therefore the best approach to understanding Yemeni law is through standard works on Islamic institutions and legal procedures. The "selective bibliography" at the end of that report indicates that at least 26 sources pertaining to law in the Middle East and Islamic law had been consulted.

The report from the Library of Congress points out that the Constitution of the Yemen Arab Republic, adopted on December 30, 1970, stated that Yemen was an Arab Islamic state, that the Islamic Shari'ah was the source of all laws, and that no one should occupy judicial posts except scholars of the Shari'ah law.[2] The sources of Islamic law, in the order of their weight and priority are:

(1) The Qur'ān (which is the word of God);
(2) The traditions or Sunna of the Prophet (which is his behavior and sayings during his lifetime);
(3) Ijmā', or consensus of opinion of scholars; and
(4) Qiyās, or analogy.

---

[1] There are several other published decisions in which we have held that there is no system for legal adoption under Islamic law. *Matter of Bhegami,* 15 I. & N. Dec. 299 (BIA 1975); *Matter of Boghdadi,* 12 I. & N. Dec. 666 (BIA 1968).

[2] The report states that the word "Shari'ah" means "the Islamic way of life of a Muslim, who must follow its precepts in his daily life."

The report quotes the Qur'an's prohibition of adoption which is contained in verses 4 and 5 of Chapter XXXIII, entitled al-Ahzab (the Clans):

4. God has not made
   For any man two hearts
   In his (one) body; nor has
   He made your wives whom
   Ye divorce by Zihār
   Your mothers: nor has He
   Made your adopted sons·
   Your sons. Such is (only)
   Your (manner of) speech
   By your mouths. But God
   Tells (you) the truth, and
   He shows the (right) way.

5. Call them by (the names
   of) their fathers: that is
   Juster in the sight of God.
   But if ye know not
   Their father's (names, call
   Them) your Brothers in faith,
   Or your Maulās.
   But there is no blame
   On you if ye make
   A mistake therein:
   (what counts is)
   The intention of your hearts:
   And God is Oft-Returning,
   Most Merciful.[3]

The report also quotes the following interpretation of the passages quoted from the Qur'ān:

If a man called another's son "his son," it might create complications with natural and normal relationships if taken too literally. It is pointed out that it is only a façon de parler in men's mouths, and should not be taken literally. The truth is the truth and cannot be altered by men's adopting "sons." "Adoption" in the technical sense is not allowed in Muslim law. Those who have been "wives of your sons proceeding from your loins" are within the Prohibited Degrees of marriage; iv. 23: [footnote omitted] but this does not apply to "adopted" sons.

Freedmen were often called after their master's name as the "son or [of ?] so and so." When they were slaves, perhaps their fathers' names were lost altogether. It is more correct to speak of them as the Maulā [a freed slave] or [of ?] so and so. But Maulā in Arabic might also imply a close relationship of friendship: in that case, too, it is better to use the right term instead of the term "son." "Brother" is not objectionable, because "Brotherhood" is used in a wider sinse than "fatherhood" and is not likely to be misunderstood.

What is aimed at is to destroy the superstition of erecting false relationship to the detriment or loss of true blood relations. It is not intended to penalise an unintentional

---

[3] Abdullah Yousuf Ali. *The Holy Qur'an: Text, Translation and Commentary*, Vol. II, pp. 1102–1103 (Cambridge, Massachusetts 1946).

slip in the matter, and indeed, even if a man deliberately calls another his son or father, who is not his son or father, out of politeness or affection, "God is Oft-Returning, Most Merciful." It is the action of mischievous parties which is chiefly reprehended, if they intend false insinuations. A mere mistake on their part does not matter.[4]

The report indicates that a type of relationship loosely referred to as "adoption" exists in the Yemen Arab Republic, but that this form of relationship is merely in the nature of charitable aid to orphans. The report states:

> It appears that the practice of taking a child from an orphanage or from his natural parents, with their permission, and giving him to others who prove capable of taking care of him and giving him a better home is accepted. It is, however, a misnomer to call it adoption for reasons discussed in this report. It is, instead, a charitable attitude, very much encouraged according to the teaching of the Muslim religion.

In response to the contentions raised in these and other recent cases involving adoption under the law of the two Yemens, we consulted the Library of Congress again for an updated report. That report, dated August 4, 1975, informed us that although the Constitution of 1970 of the Yemen Arab Republic had been repealed as of June 19, 1974, the provisions relating to the applicability of Islamic law were retained in full in the new interim constitution.[5] The report also related that a new and complete search of all available sources on the law of the two Yemens was undertaken and that such search disclosed no changes in the law relating to adoption.[6]

Counsel cites *Matter of Poon*, 14 I. & N. Dec. 155 (BIA 1972), and *Matter of Rodriguez*, 14 I. & N. Dec. 335 (BIA 1973), for the proposition that customary adoptions are recognized under the immigration laws. See also *Matter of Ng*, 14 I. & N. Dec. 135 (BIA 1972). However, there are material differences between the present situation and the cited cases which all involved adoptions under Chinese law and custom in Hong Kong.

In the latter decisions, we found that the law applicable to Chinese domiciled in Hong Kong was Chinese law and custom. We further found that there were two forms of adoption practiced under Chinese law and custom, and we were satisfied that the "simple" form of customary adoption created a legal status comparable, if not precisely identical, to that of a natural legitimate child.

On the other hand, in the present cases we find that the law applicable in the Yemen Arab Republic is Islamic law, that the practice of adoption

---

[4] Id.

[5] The pertinent provisions of the interim constitution are set forth in the Appendix.

[6] The new research included an examination of a 987-page volume in Arabic entitled *Compilation of Legislation of the Arab Republic of Yemen*, arranged under the supervision of the Office of Legal Adviser for the Presidential Council and Council of Ministers, which contains all legislation passed in the Yemen Arab Republic through July 1972.

is not recognized under Islamic law, and that the informal relationship sometimes loosely termed "adoption" in the Yemen Arab Republic does not create a legal status comparable to that of a natural legitimate child. We have on prior occasions declined to recognize for immigration purposes an alleged "adoptive" relationship that does not create a legal status comparable to that of a natural legitimate child. *Matter of Kong*, 14 I. & N. Dec. 649 (BIA 1974, motion to reconsider denied, *Matter of Kong*, 15 I. & N. Dec 224 (BIA 1975); *Matter of Chang*, 14 I. & N. Dec. 720 (BIA 1974).

Counsel has submitted a translated copy of a document from the General Mufti (Religious and Legal Authority) for the Yemen Arab Republic dated Stptember 4, 1973. That document states:

> In response to a request by the Ministry of Foreign Affairs of the Yemen Arab Republic to give a legal decision on 'Adoption' as practiced in Yemen,
> I hereby decide that 'Adoption' means guardianship, custody, protection, care and help of the effluent and wealthy to the poor.
> This is the Yemeni custom and the established usage of adoption which comply with the Islamic Religion and does not confirm relationship, kinship or inheritance[.]

The foregoing document is consistent with the information contained in the Library of Congress report and further confirms that such "adoption" as exists in the Yemen Arab Republic is merely in the nature of charitable aid to needy children and does not create a legal relationship comparable to that existing between a parent and his or her natural legitimate child.

Our review of the entire record, including the information submitted by counsel, satisfies us that our decision in *Matter of Ashree, Ahmed and Ahmed* was correct. Consequently, we reaffirm that decision.

Finally, counsel claims that the Government is estopped from excluding the applicants because (1) the applicants' visa petitions were approved prior to our decision in *Ashree*, (2) with respect to two of the applicants, immigrant visas were issued prior to the decision in *Ashree*, (3) the applicants arrived in the United States prior to general public availability of the decision in *Ashree*, and (4) the Service does not have authority to override the determinations of the Department of State.

Counsel's argument is not well taken. Congress specifically provided for a system of dual checks under the Act. Section 204(e) provides:

> Nothing in this section shall be construed to entitle an immigrant, in behalf of whom a petition under this section is approved, to enter the United States as a preference immigrant under section 203(a) or as an immediate relative under section 201(b) if upon his arrival at a port of entry in the United States he is found not to be entitled to such classification.

Section 235(b) of the Act provides, in pertinent part:

> Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273(d), who may not appear to the examining

434

immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer [immigration judge] . . . .

Thus, the Service not only is empowered to make a redetermination of an applicant's admissibility when he arrives at the border with an immigrant visa, but it is under an absolute duty to do so. Under these circumstances, the Government cannot be estopped from excluding the applicants.

The immigration judge correctly ordered the applicants' exclusion and deportation from the United States. The appeals will be dismissed.

ORDER: The appeals are dismissed.

## APPENDIX

### RELEVANT PROVISIONS OF THE INTERIM CONSTITUTION OF THE YEMEN ARAB REPUBLIC, EFFECTIVE JUNE 19, 1974.

(Source: Library of Congress Memorandum dated August 4, 1975).

*Art. 1.* Yemen is an Arab Islamic and independent state enjoying full sovereignty. Its system of government is republican.

*Art. 3.* Islam is the state religion of Arabic the official state language.

*Art. 4.* The Islamic Shari'ah is the source of all laws.

*Art. 17.* The judiciary is independent, and there shall be no authority over it except the law. Its verdicts shall be handed down and executed in accordance with the principles of Shari'ah.

*Art. 18.* All the rules determined by the laws, by-laws and decisions prior to the issuance of this constitutional declaration shall remain in force unless they conflict with the rules of this declaration or unless they are amended or revoked.

435