**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0717n.06

Case No. 20-1576

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 23, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ABUDUFATAH ABDULLA, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| KENNETH CUCCINELLI, et al., | ) | MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge.** In this immigration matter, we consider the Board of Immigration Appeals' ("BIA") denial of Abudufatah Abdulla's five petitions to classify certain noncitizens as immediate relatives. Specifically, we consider whether the BIA's denial was arbitrary and capricious under the Administrative Procedure Act ("APA"), and whether the denial complied with due process. Because we hold the BIA's decisions were not arbitrary and capricious and because the afforded procedures satisfied due process, we affirm the district court's grant of summary judgment in favor of the government.[1]

---

[1] Abdulla's brief asserts that he also appeals the district court's grant of summary judgment in favor of the government on Abdulla's Declaratory Judgment Act claim. Nowhere in his briefing, however, does Abdulla submit any arguments relevant to the declaratory judgment claim, nor did he do so before the district court despite Defendants moving for summary judgment on that claim. In any event, Abdulla's complaint requests a declaration under 28 U.S.C. § 2201 that Defendants' actions were arbitrary and capricious, but because we hold the actions were not arbitrary and capricious under the APA, Abdulla's claim under the Declaratory Judgment Act must also fail.

## I. BACKGROUND

A. **Abdulla's I-130 Petitions before USCIS**

Plaintiff-Appellant Abudufatah M. Abdulla has been a naturalized U.S. citizen since 2008. On November 9, 2010, Abdulla filed five I-130 Petitions for Alien Relative on behalf of his claimed wife (Musa) and four children (Wagdi, Mohamed, Manal, and G.A.). Such petitions provide for "immediate relative status" which would thereafter allow Abdulla to pursue an immigration visa for Musa and the four children. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i) and 1154(a)(1)(A)(i). Regarding Musa, a Yemen national, Abdulla submitted a Yemeni marriage contract showing he and Musa married on September 25, 2002, but that marriage contract was not registered in Yemeni's civil records until 2009. In further support of the I-130 petition for Musa, Abdulla submitted a death certificate for Musa's allegedly former husband, Mohmed Muthana Ali Saleh ("Saleh"), showing Saleh's death on February 25, 2001; that certificate was not registered in Yemen until December 15, 2002. Abdulla also provided a letter (with an unknown date) from Musa in which she expresses her love for Abdulla and explains that all four children "are all your children and my children with one father and one mother." Abdulla himself wrote a letter (dated October 27, 2010) in which he asserts that Musa's parents "married her off" to Saleh during which Abdulla and Musa continued to see each other.

For three of the claimed children (Wagdi, Mohamed, and Manal), Abdulla provided birth certificates listing *Saleh* as the biological parent. The birth certificates for Mohamed and Manal were registered six years after the listed birth, and the certificate for Wagdi was registered nine years after the listed birth. For G.A., who Abdulla alleges was born during the claimed marriage between himself and Musa, the included birth certificate listed Musa and Abdulla as the biological parents, and the certificate was registered the same year as the listed birth (2006).

On October 4, 2012, the U.S. Citizenship and Immigration Services ("USCIS") responded with an I-797E Notice of Action in which it requested additional evidence from Abdulla. First, regarding Saleh's death certificate, USCIS noted that the "Yemeni death record [Abdulla] submitted regarding [Saleh] was created significantly after the time of his actual death" and "[t]herefore, USCIS has determined that additional evidence regarding the death must be submitted so that we may determine whether the death record is sufficient and reliable evidence of the death." USCIS explained that Abdulla could submit various types of "secondary documentary evidence" including medical documents, inheritance documents, any documentation regarding the cause or circumstances of Saleh's death, or newspaper articles mentioning the death. The USCIS notice explained that secondary evidence should be contemporaneous with the alleged death. However, if Abdulla were unable to provide such secondary evidence, USCIS explained that he could submit his own affidavit explaining the unavailability of the secondary evidence, as well as at least two affidavits from people with personal knowledge of the death.

Second, USCIS requested secondary evidence regarding the claimed marriage between Abdulla and Musa because "it has been determined that the bona fide nature of the claimed spousal relationship has not yet been established." The request included a non-exhaustive list of various forms of secondary evidence including copies of correspondence, photos of the wedding ceremony or any visits to Yemen, wedding announcements, property deeds showing co-ownership, or travel receipts.

Third, USCIS requested additional evidence regarding the four children. For Wagdi, Mohamed, and Manal, USCIS noted that for each birth certificate, the delay between the listed birth and the creation of the birth certificate made the certificates unreliable. USCIS, therefore, requested additional secondary evidence including, for example, religious documents, hospital

certificates, school records, or DNA testing results. USCIS explained that if Abdulla could not obtain any permissible secondary evidence, he needed to explain the nonexistence of that evidence, explain the delayed registration of the birth certificates, and provide two or more affidavits from persons with personal knowledge of the birth of Wagdi, Mohamed, and Manal.[2] For G.A., there was no discrepancy between the birth certificate and date of birth, but USCIS still requested secondary evidence "to establish that [Abdulla's] relationship with [G.A.] is bona fide" under the applicable regulations.

In December of 2012, Abdulla responded with additional evidence. That evidence included a cashier's check from 2011 which Abdulla argues establishes his financial support for Musa and the children. Abdulla also submitted school records for Wagdi, Mohamed, and Manal. Additionally, Abdulla included photographs that he alleges show him and the family, although he explains that he wrote the names on the back of the photographs such that those names are not visible. He included a letter from a cousin, who attested to Abdulla and Musa's marriage and who explained that they are the parents of the four children. The letter explained that Abdulla and Musa's community in Yemen knew the two had an affair while Musa was married to Saleh, a marriage the cousin attests was forced. The cousin noted that the two had a wedding ceremony on September 25, 2002 after Saleh died on February 25, 2001. Another letter from someone in Abdulla's Yemeni village asserted the same dates for Sahel's death and Abdulla and Musa's marriage, and similarly asserted that all four children are "Abdufatah [*sic*] kids[.]" Finally, Abdulla submitted a copy of a receipt showing Abdulla paid a fee for DNA testing.

---

[2] USCIS also requested evidence corroborating Saleh's death in order to establish that "all previous marriages of you and the beneficiary's natural parent were legally terminated and that you and the beneficiary's natural parent were legally free to enter into the marriage."

In April 2013, USCIS denied each I-130 petition. Regarding Musa, USCIS held that the secondary evidence Abdulla submitted did not contain sufficient evidence of Saleh's death. Without such evidence, USCIS held that "it has not been shown that [Musa] was legally free to enter into a valid marriage with [Abdulla]." In so holding, USCIS explained that in one of its prior decisions, *Matter of Bueno*, 21 I&N Dec. 1029 (BIA 1997), USCIS held that a delayed birth certificate is not conclusive evidence of paternity even if unrebutted by other evidence; here, USCIS extended that logic to death certificates.

USCIS also denied the petitions for the children, determining that Abdulla had not shown the children were either his stepchildren or biological children. For Wagdi, Mohamed, and Manal, USCIS denied the petitions because of Saleh's delayed death certificate and the children's delayed birth certificates. For all four children, USCIS determined the children were not Abdulla's stepchildren for the same reason Abdulla had not shown Musa was his wife: the lack of corroborating evidence regarding Saleh's death prevented Abdulla from showing that Musa was free to marry Abdulla, and qualification as stepchildren was "contingent upon the validity of the underlying marriage."

USCIS alternatively held that Abdulla failed to show any of the children were his biological children. For Wagdi, Mohamed, and Manal, the birth certificates Abdulla initially supplied showed Saleh as the biological parent. For G.A., though the birth certificate does show Abdulla as the father, USCIS found that the additional evidence Abdulla submitted did not corroborate that relationship as required by regulation. For all four children, USCIS explained how each piece of additional evidence failed to establish or corroborate biological parentage. First, USCIS found that the photos appear to be recent photos and "[a]s such, they cannot be considered credible evidence of the alleged biological parentage." As to the DNA-testing receipt, USCIS noted that it

had not (at that time) received confirmation that Abdulla was pursuing DNA testing. Considering the cashier's check, USCIS noted that it "does not show evidence of biological parentage. Finally, as to the two letters attesting to Abdulla's relationship to the children, USCIS found them to be neither contemporaneous nor persuasive in establishing biological parentage.

B. **The BIA Dismisses Abdulla's Appeals**

Abdulla appealed the USCIS decisions to the BIA. In September 2014, the BIA found no error in those decisions and thus dismissed Abdulla's appeals. Regarding the I-130 petition for Musa, the BIA explained that USCIS "correctly concluded that [Abdulla] did not provide sufficient evidence establishing the claimed relationship between himself and the beneficiary." The BIA agreed with USCIS that more than Saleh's late-registered death certificate was needed to establish Saleh's death, a prerequisite to showing that Musa was free to marry Abdulla. The BIA found that Abdulla did not submit any proper secondary evidence to substantiate Saleh's death. Additionally, the BIA explained that Abdulla's purported "tertiary evidence"—letters from his cousin and friend—were insufficient because (1) Abdulla did not explain the lack of availability of other secondary evidence, a requirement before one may submit such tertiary evidence, and (2) the statements did not state that they had firsthand, contemporaneous knowledge of Saleh's death. 8 C.F.R. § 103.2(b)(2). Though it dismissed the appeal, the BIA explained that Abdulla could file a new petition on Musa's behalf with competent supporting evidence.

Regarding Wagdi, Mohamed, and Manal, the BIA agreed with USCIS that Abdulla submitted insufficient evidence of a step-relationship because Abdulla submitted no secondary evidence to substantiate Saleh's death and thus Musa's ability to marry Abdulla. Additionally, the BIA agreed with USCIS that Abdulla submitted insufficient evidence to show the children were his biological children. The birth certificates list Saleh as the father, Abdulla did not submit DNA

evidence, and Abdulla did not present evidence that the children were legitimated, or that he had a bona fide parent-child relationship with the children. Regarding G.A., the BIA explained that while typically a child born during a marriage is considered "legitimate," and thus presumed to be the biological child of the husband, that presumption does not apply in this case because there was a question regarding the validity of the 2002 marriage between Abdulla and Musa. The BIA agreed with USCIS that Abdulla's responsive supplemental evidence (1) was unrelated to G.A.'s birth and (2) did not comply with the requirements regarding tertiary evidence. For all four children, the BIA again noted that Abdulla could file a new visa petition supported by competent and sufficient evidence.

## C.     **Abdulla Files Motions for *Sua Sponte* Reopening Before the BIA**

Several years later, an attorney for Abdulla filed motions to reopen the BIA's 2014 decisions dismissing the appeals.[3] The attorney asked the BIA to use its "*sua sponte* motion authority" or its "plenary jurisdiction" to reopen the cases. Attached to the motions were DNA laboratory results indicating that Abdulla is likely the biological father of Mohamed, Wagdi, and Manal. Also included were three birth certificates, registered in May 2016, now showing that Abdulla—rather than Saleh, as listed on the previous birth certificates—was the father of Mohamed, Manal, and Wagdi. Additionally, the attorney included several articles regarding conditions and marriage practices in Yemen.

---

[3] Defendants assert that the motion was filed in March 2017. A Form I-797C, Notice of Action— essentially a filing receipt—shows that USCIS received the motion on March 22, 2017. However, a separate EOIR-29 (Notice of Appeal), which Defendants also cites as evidence of the March 2017 filing, is dated May 14, 2016. In any event, the motion to reopen was late, as such motions to reopen "must be filed no later than 90 days after the date on which the final administrative decision was rendered[.]" 8 C.F.R. § 1003.2(b)(2). Presumably, then, this is why the attorney representing Abdulla requested that the BIA reopen the case pursuant to § 1003.2(a), whereby the BIA may reopen at any time "on its own motion." *Id.* § 1003.2(a).

In response, the Department of Homeland Security ("DHS") filed a response that requested the BIA dismiss the motions because the "motioning party" is not an "affected party" under the relevant regulations, as the attorney did not file a notice of appearance as required by 8 C.F.R. § 1003.3(a)(3). That regulation requires a moving attorney to file a Form EOIR-27 ("Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals"). The BIA accordingly notified Abdulla's attorney that she did not filed a proper notice of entry. The BIA also issued a filing receipt, dated July 18, 2017, which warned Abdulla that "[y]our appeal may be dismissed for lack of jurisdiction, unless there is a clear indication that your attorney represents you, the petitioner, and you have authorized this appeal." Additionally, the BIA noted that it would not recognize a Form G-28 which is a notice of entry form to appear before *USCIS*, not the BIA.[4] On August 8, 2017, the BIA issued another notice that the then-submitted EOIR-27 form was rejected for several procedural errors including a missing EOIR ID and missing pages.

On February 28, 2018, the BIA denied the motions to reopen. The BIA denied the motion on two alternative grounds. First, the BIA denied the motions for lack of jurisdiction. Abdulla himself did not sign the motions; rather, the attorney signed them, and she did not provide an "accepted" Form EOIR-27 despite the BIA previously notifying her that the provided forms were not acceptable. Because only the petitioner (Abdulla) or an authorized representative under 8

---

[4] Abdulla's counsel attached the incorrect Form G-28 to each motion to reopen. In its briefing before this Court, Abdulla claims that the Form G-28 "specifically authorized his previous attorney to file the motion to reopen." He argues that the BIA's decision "never addressed the signed G-28" forms. However, as noted above, a Form G-28 is a notice of entry before USCIS, not the BIA, an error to which the BIA alerted Abdulla. *See* R. 11-1, PageID #142 (explaining to Abdulla that "**[t]he Board will not recognize a Form G-28[.]**") (emphasis in original).

Additionally, Abdulla points out in his briefing that he *did* submit the correct Form EOIR-27, contrary to the BIA's assertion otherwise. However, the Form EOIR-27s that Abdulla did submit (which he only did for Wagdi and Manal) were rejected due to several errors such as missing pages; in any event, the BIA and the district court considered the merits of Abdulla's motions, missing forms and procedural errors notwithstanding.

C.F.R. § 1003.2(a) may initiate a motion to reopen, the BIA determined that it lacked jurisdiction to consider the motion to reopen *sua sponte*.

Second, the BIA alternatively ruled on the merits that even if it did have jurisdiction, the BIA would deny the motion because "the petitioner did not submit new, relevant evidence to reopen." Regarding Musa, the BIA explained that "[t]he critical issue in this case is the validity of the [Abdulla's] current marriage to [Musa]." The BIA explained that neither the new DNA evidence nor the evidence regarding arranged marriages in Yemen related to the death of Saleh and, as such, none of the evidence related to the validity of Abdulla and Musa's marriage.[5] Regarding the children, the BIA acknowledged that the new DNA evidence did indicate that the children are Abdulla's biological children. However, the BIA wrote, "that is not sufficient evidence to reopen in this case." For Mohamed, Wagdi, and Manal, the new evidence showed that the children were born out of wedlock, i.e., when Musa was still married to Saleh. According to the applicable regulations, Abdulla must thereafter show that either he "legitimated" the children or established a "bona fide" father-child relationship, and the newly-provided evidence did neither. Additionally, Abdulla was required to show that the prior marriage between Musa and Saleh had terminated, and as the BIA explained in 2017, Abdulla's submissions did not sufficiently show that Saleh died. As to G.A., the BIA acknowledged that G.A.'s timely-registered birth certificate indicated he was Abdulla's biological child, but again, Abdulla was required to show that the prior marriage between Musa and Saleh had terminated such that G.A. was legitimated; alternatively, Abdulla failed to provide new evidence regarding a bona fide father-child relationship. For each denial, the BIA indicated that Abdula "may file a new visa petition on the beneficiary's behalf that

---

[5]Abdulla does not clearly appeal—or make arguments regarding—the denial of Musa's petition. Rather, his arguments stem from his assertion that the BIA should have reopened the case given the DNA evidence, evidence which would support only the children's petitions and not Musa's.

is supported by evidence necessary to establish the beneficiary's eligibility for the status sought under the immigration laws."

### D.       **District Court Proceedings**

Abdulla then filed the instant lawsuit in July of 2018, bringing suit against DHS and USCIS as well as several officials within each (hereinafter "Defendants").  Abdulla, on behalf of himself and his claimed beneficiaries, asserted he was entitled to mandamus relief as well as relief under the APA; additionally, he brought substantive and procedural due process claims.  He finally sought, under the Declaratory Judgment Act, a declaration that Defendants violated the APA and Abdulla's due process rights.  The district court granted summary judgment to Defendants on all claims.  Regarding the mandamus claims, the district court found there was no outstanding duty owed to Abdulla or his family members and, as such, mandamus relief was unavailable.[6] Regarding Abdulla's claim that Defendants' actions were arbitrary and capricious under the APA, the district court found that the agency's decisions regarding the merits of the I-130 Petitions were proper and reasonable applications of the applicable regulations.

As to Abdulla's claims that Defendants violated his substantive due process right to family integrity and privacy, the district court explained that "Abdulla's right to maintain a family does not override Congress' power to regulate immigration."  Finally, regarding Abdulla's procedural due process claim, the district court found that even if Abdulla had a protected liberty interest, he received all process due to him, as he received "notice of USCIS's intent to deny the petitions, an opportunity to submit supplemental evidence, an opinion regarding the reasons for the denial, and an appeal."  Thereafter, Abdulla filed a timely notice of appeal.

---

[6] On appeal, Abdulla has abandoned the mandamus claims under both the Mandamus Act and the APA § 706(1).

## II. ANALYSIS

A.     **Standard of Review**

While we review a district court's grant of summary judgment *de novo*, we review the agency's actions under the arbitrary and capricious standard. *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (citing *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007)). An agency's decision will be set aside only if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency's decision is "arbitrary and capricious if the agency fails to examine relevant evidence or articulate a satisfactory explanation for the decision." *Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983)). This is a "narrow standard of review" under which "a court is not to substitute its judgment for that of the agency." *Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1905 (2020) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)). Despite that narrow review, we must still "ensure that the agency 'articulate[d] a rational connection between the facts found and the choice made and . . . provide[d] something in the way of documentary support for its action.'" *Hosseini*, 911 F.3d at 371 (quoting *GTE Midwest, Inc. v. Fed. Commc'ns Comm'n*, 233 F.3d 341, 345 (6th Cir. 2000)). In general, the agency must consider the relevant factors and engage in "reasoned decisionmaking[.]" *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

B.     **Jurisdictional Claims**

As a preliminary matter, Defendants argue that this Court does not have jurisdiction to review the denial of a motion to reopen. In support, they cite to *Rais v. Holder*, 768 F.3d 453 (6th Cir. 2014), in which this Court held that it lacked jurisdiction to review the BIA's denial of a

motion to reopen *removal* proceedings. *See id.* at 460. Even putting aside the distinction between visa petitions and removal proceedings, Defendants did not raise this jurisdictional argument before the district court, and such issues that are "not presented to the district court but raised for the first time on appeal are not properly before this [C]ourt." *J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir. 1991).

Separate from Defendants' argument that this Court lacks jurisdiction is the BIA's alternative holding that the *BIA* itself lacked jurisdiction to consider Abdulla's motions to reopen given the procedural errors. This determination was not erroneous. A request to reopen or reconsider must be made "by the Service, or by the party affected by the decision." 8 C.F.R. § 1003.2(a).[7] Abdulla did not himself sign or file the motions with the BIA; his attorney did. Such a representative's signature is acceptable as long as the representative signs the appropriate form, the Form EOIR-27. 8 C.F.R. § 1292.4(a). After notifying Abdulla's attorney and providing a chance to cure the missing forms, Abdulla's attorney submitted the Form EOIR 27s (for only two out of five petitions), but the BIA noted several remaining deficiencies, including missing pages, in those that the attorney did provide. These deficiencies led the BIA to conclude that it (1) had not received an acceptable Form EOIR-27 with the petitions, and (2) that deficiency divested the BIA of jurisdiction to reopen the petitions. Abdulla's arguments to the contrary—that he filed a "signed authorization" that "specifically authoriz[ed] his attorney to file each motion to reopen"— is without merit because the forms he did provide for each motion, the Form G-28, authorized a representative to appear before USCIS, not the BIA. *See* G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, USCIS, https://www.uscis.gov/g-28.

---

[7] The term "Service" here refers to the Immigration and Naturalization Service, as it existed prior to March 1, 2003. References to the "Service" after that date refer to the offices of DHS. 8 C.F.R. § 1001.1(c).

Given the failure to file the correct forms, and the deficiencies noted in those forms that *were* correctly filed for two of the petitions, the BIA's decision to deny the motions to reopen on these grounds was not arbitrary and capricious.[8] Nonetheless, we will do as both the BIA and the district court did in alternatively analyzing the merits of Abdulla's claims, notwithstanding the filing errors with the Form EOIR-27.

### C. APA Claim

Turning first to Abdulla's claim under the APA, he asserts that the BIA's decision to deny his motions to reopen was arbitrary and capricious "because the agency did not consider all of the information before the agency and [altogether] failed to consider and apply the controlling legal standard[.]"[9] Abdulla lists the evidence he believes the BIA failed to consider in its denial of the motions, and believes that the BIA wrongly predicated its decision on the validity of Abdulla's marriage to Musa instead of considering that new evidence. Defendants respond that the new evidence, including the DNA results showing a high likelihood that the children are biologically Abdulla's, has no bearing on the BIA's analysis because that evidence does not resolve the regulatory deficiencies that USCIS and the BIA noted with Abdulla's petitions.

The Immigration and Nationality Act ("INA") and the associated regulations provide the process for filing the Form I-130 petition for immediate relative status. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i); 1154(a); *see also* 8 C.F.R. § 204.1(a)(1). In such petitions, it is the petitioner's burden to establish eligibility for the requested immigration benefit. *See Matter of*

---

[8] Abdulla argues that Defendants waived this claim by failing to raise this basis for the BIA's decision before the district court. However, in its motion for summary judgment, Defendants explained that the BIA denied Abdulla's motion to reopen for lack of jurisdiction and asserted that this decision was not arbitrary and capricious.

[9] As another additional matter, though Abdulla specifically appeals only the denial of the motions to reopen, here we must also consider the merits of the BIA's *initial* denial (in 2014), as those orders and the evidence presented thereto are relevant to whether Abdulla submitted any new evidence in his motion to reopen that would alter the BIA's initial conclusions.

*Brantigan*, 11 I&N Dec. 493, 495 (BIA 1966); *see also* 8 C.F.R. § 103.2(b)(1) ("An applicant or petitioner must establish that he or she is eligible for the requested benefit[.]").

A United States citizen or lawful permanent resident may file a petition on behalf of a spouse if the petitioner submits a "certificate of marriage issued by civil authorities, and proof of the legal termination of all previous marriages of both the petitioner and the beneficiary." 8 C.F.R. § 204.2(a)(2). Though Abdulla does not clearly raise any arguments on appeal specifically regarding the denial of the motion to reopen the petition for Musa, the denial of that motion was not arbitrary and capricious. To establish that marriage, USCIS requested that Abdulla submit additional credible evidence regarding the termination of Musa's prior marriage to Saleh. USCIS determined that the delayed marriage and death certificates necessitated further secondary evidence. Abdulla, however, did not submit proper secondary (or tertiary) evidence corroborating Saleh's death, and USCIS was not required to find credible the letters Abdulla submitted in support of his petition. 8 C.F.R. § 103.2(b)(2)(iii) ("The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of USCIS."). The BIA explained that "[t]he critical issue in this case is the validity of [Abdulla's] current marriage to [Musa]" because the "late-registered death certificate of [Saleh] and affidavits are insufficient evidence" that Musa was free to marry Abdulla. Because Abdulla's motions to reopen provided no new evidence relevant to Saleh's death, the BIA's decision to deny the motion to reopen Musa's petition was not arbitrary and capricious.

The rules are more complex for children. In relevant part, the INA provides that:

(1) the term "child" means an unmarried person under twenty-one years of age who is
   (A) a child born in wedlock;

   (B) a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred;

> (C) a child legitimated under the laws of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation;
>
> (D) a child born out of wedlock, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother or to its natural father if the father has or had a bona fide parent-child relationship with the person[.]

8 U.S.C. § 1101(b)(1)(A)-(D). The associated regulations provide greater detail regarding what evidence is required for each statutory subsection. *See* 8 C.F.R. § 204.2(d)(2)(i)-(iv).

USCIS first determined, and the BIA affirmed (and later re-affirmed), that Abdulla did not show that Wagdi, Mohamed, and Manal were Abdulla's stepchildren. To establish a claimed beneficiary as a stepchild, Abdulla needed to submit evidence that, among other things, he and Musa were married before the children turned eighteen. *See* 8 U.S.C. § 1101(b)(1)(B); 8 C.F.R. § 204.2(d)(2)(iv). Because Abdulla had not credibly shown—according to USCIS, the sole determiner of credibility, *see* 8 C.F.R. § 103.2(b)(2)(iii)—that Musa was free to marry, given her prior marriage to Saleh, USCIS and the BIA concluded Abdulla had not met his burden of showing the three children were his stepchildren. As the BIA concluded in denying the motions to reopen, the newly submitted evidence did not help fill this gap: the new evidence still did not establish that Saleh died and that Musa was thereafter free to marry Abdulla.

The same was true when considering whether the children were "legitimated" through the later marriage of Abdulla and Musa; the "critical issue" in this case, according to the BIA, was the validity of that marriage which would thereby "legitimate" the children. *See* C.F.R. § 204.2(d)(ii); 8 U.S.C. § 1011(b)(1)(C). Because Abdulla did not submit evidence that credibly showed the termination of that prior marriage, he could not show that the children were legitimated through

his later marriage.[10]  As with the analysis regarding whether the children were stepchildren, the new evidence—including the DNA evidence—did not change this assessment.[11]

Next, considering the children as "illegitimate" because they were born out of wedlock, Abdulla was required to show that he was (1) the natural father and (2) that a bona fide father-child relationship was established before the children were twenty-one.  8 U.S.C. § 1011(b)(1)(D); 8 C.F.R. § 204.2(d)(2)(iii).  Primary evidence required in support of establishing an "illegitimate" child includes a birth certificate showing the father's name, but the birth certificates for Wagdi, Mohamed, and Manal all had *Saleh*'s name.  The addition of the DNA evidence, the BIA concluded, did not change the analysis—including for G.A., whose birth certificate *did* list Abdulla—because the required evidence "should establish more than merely a biological relationship."  8 C.F.R. § 204.2(d)(2)(iii); *see also* 8 U.S.C. § 1011(b)(1)(D) (requiring both biological parenthood and a bona fide relationship).  Establishing that Abdulla was the natural father, without more, would not suffice.  To establish a bona fide father-child relationship, the regulations required Abdulla to submit evidence of "[e]motional and/or financial ties or a genuine concern and interest by the father for the child's support, instruction, and general welfare[.]"

---

[10] The petition for G.A. faced the same problem: the lack of sufficient evidence showing the termination of the marriage between Musa and Saleh.  Thus, even with a birth certificate listing Abdulla's name, Abdulla did not show that G.A. was "legitimated" through the marriage of Musa and Abdulla.  Nor could Abdulla show that G.A. was born in wedlock under 8 U.S.C. 1011(b)(1)(A) because Abdulla had not shown that Musa's prior marriage was terminated.

[11] Abdulla also argues that under Yemeni law, any natural-born child is automatically legitimated.  In support of this argument, Abdulla cites to *Matter of Mozeb*, 15 I&N Dec. 430 (BIA 1975), but the relevance of that case is unclear.  There, the BIA determined "that the law applicable in the Yemen Arab Republic is Islamic law, that the practice of adoption is not recognized under Islamic law, and that the informal relationship sometimes loosely termed 'adoption' in the Yemen Arab Republic does not create a legal status comparable to that of a natural legitimate child."  *Id.* at 433-34.  This does not create a broad rule that any Yemeni-born child is automatically legitimated, nor did Abdulla raise this argument below.  In any event, Abdulla carried the burden of establishing *which* legitimation law he intended to rely upon, and he did not do so here until this appeal.  *See Matter of Martinez-Gonzalez*, 21 I&N Dec. 1035, 1037 n.2 (BIA 1997) (considering only the legitimation laws of the country raised in petition).

8 C.F.R. § 204.2(d)(2)(iii).  Further,

> There should be evidence that the father and child actually lived together or that the father held the child out as being his own, that he provided for some or all of the child's needs, or that in general the father's behavior evidenced a genuine concern for the child.  The most persuasive evidence for establishing a bona fide parent/child relationship and financial responsibility by the father is documentary evidence which was contemporaneous with the events in question.

*Id.*  As USCIS and the BIA concluded, the non-primary evidence that Abdulla submitted in support of his petitions, both initially and in his motions to reopen, did not sufficiently show the bona fide nature of a father-child relationship.

In sum, the BIA concluded—first in its affirmance of USCIS's denial of the petition and second in its denial of Abdulla's motions to reopen—that Abdulla had not shown that his marriage to Musa was valid or that his relationship with the children met any of the statutory and regulatory criteria for immediate relative status.  The BIA examined the relevant evidence and articulated a satisfactory explanation for its decisions.  *Bangura*, 434 F.3d at 502.  The agency considered the relevant factors and engaged in reasoned decisionmaking.  *Michigan*, 576 U.S. at 750.  That we might reach a different decision has no bearing on our review, as we may not substitute our own judgment for that of the agency.  *Regents of the Univ. of Ca.*, 140 S. Ct. at 1905.  As did the BIA, we reiterate here that Abdulla may file new visa petitions in which he provides the appropriate evidence necessary to establish the claimed beneficiaries' eligibility.  Providing the evidence through *new* applications rather than in an appeal (or motion to reopen) before the BIA will permit the USCIS to consider Abdulla's evidence anew—including the DNA results—rather than the narrow review available to the BIA and Article III courts.  *See* 8 C.F.R. § 103.2(b)(2)(iii) ("The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of USCIS.").

D.        **Due Process Claim**

Finally, we consider Abdulla's procedural due process claim.[12]  Before the district court,

he generally claimed that the Yemeni I-130 adjudication "scheme" violated his due process rights,

as "the Defendants' policies, as applied to the Plaintiffs' cases, amounted to nothing more than an

exercise in futility, and the Defendants have attempted to invalidate the will of Congress."  On

appeal, Abdulla makes essentially two procedural due process claims, one broad and one narrow.

His broad claim is that the BIA's "process of requiring all appeals and motions to first be filed

with USCIS who is the adverse party in the appeal who then forwards the record to the [BIA] for

consideration of the appeal violates due process" in that the "process affords USCIS an unfair

advantage[.]"[13]  His narrow claim is that Defendants violated his due process rights by "failing to

apply the required legal standard as establish by regulation."  Essentially, he argues that the BIA

failed to consider all of the evidence presented in support of his petitions.

The Fourteenth Amendment prevents the government from depriving persons of "life,

liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV, § 1.  Due process

rights attach only when a plaintiff asserts a liberty or property interest granted by the Constitution,

a federal statute, or a state statute.  *Bangura*, 434 F.3d at 496.  To succeed on a procedural due

process claim, a plaintiff must show that (1) he or she was deprived of a protected liberty or

property interest, and (2) the "deprivation of that interest contravened notions of due process."

*Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002).  Such due process requires only "the

---

[12] Before the district court Abdulla claimed Defendants violated his substantive due process rights to family integrity and privacy.  On appeal, Abdulla does not challenge the denial of this claim.

[13] Abdulla did not make this broad argument before the district court, and such issues not litigated below are inappropriate for appellate consideration. *Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 544 (6th Cir. 1996).

opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted).

Whatever protected liberty or property interests Abdulla[14] may have under the first element, Abdulla's due process claim fails because he received sufficient process. When Abdulla first submitted his five I-130 petitions to USCIS, the agency submitted an I-797E Notice of Action in which it requested additional evidence in support of the petitions. *See* 8 C.F.R. § 103.2(b)(8)(iv) (explaining process for requesting evidence or notifying of intent to deny petition). USCIS explained why it found the existing evidence insufficient and what types of evidence Abdulla needed to submit. USCIS's response comported with the regulations that require such notices to "give the applicant or petitioner adequate notice and sufficient information to respond." 8 C.F.R. § 103.2(b)(8)(iv). When Abdulla submitted additional evidence and USCIS nonetheless denied those petitions, the agency listed each piece of additional evidence and explained piece-by-piece why that evidence failed to meet Abdulla's burden of showing eligibility. Abdulla then appealed to the BIA, which offered a fully reasoned explanation for its initial dismissal of the petitions and its later denial of Abdulla's motions to reopen. Additionally, the BIA explained to Abdulla that he may still submit new applications with USCIS if "supported by evidence necessary to establish the beneficiary's eligibility for the status sought under the immigration laws." In sum, Abdulla had "notice reasonably calculated to provide actual notice of the proceeding[s] and a meaningful opportunity to be heard," and that is what due process requires in the immigration context. *See Cabrera-Ramos v. Gonzales*, 233 F. App'x 449, 453 (6th Cir. 2007) (citing *Nazarova v. INS*, 171 F.3d 478, 482-83 (7th Cir. 1999)).

---

[14] This right would attach to Abdulla and not his non-citizen spouse or children. *See Bangura*, 434 F.3d at 496 n.2 (citing *Wright v. INS*, 379 F.2d 275, 276 (6th Cir. 1967) (per curiam) (holding non-citizen spouse has no protected interest in an I-130 petition)).

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of the government on Abdulla's APA, due process, and Declaratory Judgment Act claims.